Judgment rendered August 27, 2019.

No. 53,262-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Plaintiff-Appellee

versus

ANTONIO WILSON                        Defendant-Appellant

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of Madison, Louisiana
Trial Court No. 2019-164

Honorable Laurie R. Brister, Judge

* * * * *

JAMES E. PAXTON                       Counsel for
District Attorney                     Appellee

ANITA TENNANT MACK
Assistant District Attorney

P. HEATH HATTAWAY                     Counsel for
JOSHUA L. CRITSELOUS                  Appellant

* * * * *

Before MOORE, GARRETT, COX, STEPHENS, and THOMPSON, JJ.

GARRETT, J., dissents and assigns written reasons.
MOORE, J., dissents and adopts written reasons assigned by Judge Garrett.

**STEPHENS, J.**

Antonio Wilson appeals a trial court judgment disqualifying his candidacy for mayor of Tallulah, Louisiana. For the following reasons, we affirm the judgment of the trial court.

## FACTS

On August 6, 2019, Antonio Wilson filed a Notice of Candidacy to seek the office of mayor of the City of Tallulah, Louisiana, in Madison Parish. Wilson listed a domicile address of 1005 West Askew Street, Tallulah, Louisiana 71282 ("the Askew address").

On August 8, 2019, Jan Buchanan, also a candidate for mayor, submitted a letter to James E. Paxton, District Attorney of the Sixth Judicial District, Madison Parish, challenging Wilson's qualifications regarding his domicile. Buchanan stated that: Wilson has not lived in Tallulah for a year preceding his qualification; a previous address claimed by Wilson, 406 6th Street, is not owned or occupied by Wilson; and, the Askew address is that of "an abandoned daycare center." Buchanan attached photographs of the Askew address allegedly taken on August 6, 2019, which show the door and windows boarded up and overgrown grass at the residence. Finally, Buchanan advised that she passes the Askew address several times a week to work and she has "seen no signs of anyone" at the residence.

On August 14, 2019, the State of Louisiana, through Paxton in his official capacity as district attorney, and in accordance with La. R.S. 18:491, *et seq.*, filed a petition objecting to the candidacy of Wilson regarding Wilson's failure to satisfy the domicile requirement for qualification to run for mayor. The DA alleged that Wilson did not reside at the Askew address for one year preceding his Notice of Candidacy for the mayoral election.

The DA cited photographic evidence that as of the week prior to qualification, the house at the Askew address had boards over the windows and was not inhabited. There was no water service; the last water service to the property was in 2014. The DA alleged that witnesses and law enforcement have advised that no one lives at the Askew address. The DA further alleged that the tax assessor's records indicate that Wilson is not the owner of the Askew property.

A hearing was conducted on August 16, 2019. Appearing on behalf of the State was the Madison Parish assistant district attorney. Wilson appeared *pro se* and did not testify on his behalf, nor did the state call Wilson as a witness. The following testimony was adduced.

Buchanan testified that she is a candidate for mayor, has resided in Tallulah for 50 years, and knew Wilson from high school. It was established through her testimony that Buchanan is a registered active voter and that she resides in the municipality. Buchanan confirmed for the court that she made the challenge to Wilson's candidacy based on her belief that Wilson had not resided in Tallulah for the year preceding his qualification. Buchanan testified that at one city council meeting she heard Wilson introduce himself and provide an address of 402 or 406 6th Street.[1] Wilson provided the 6th Street address again at a city council meeting at which Buchanan was not present, but was watching on live feed. On August 6, 2019, upon learning of Wilson's qualifying for the mayoral race, Buchanan went to the Askew address and took pictures with her cell phone. The letter Buchanan wrote to

_____

[1] Apparently, the address as allegedly stated by Wilson was 406 6th Street, but, according to Buchanan, the 911 address for that property is 402 6th Street. This property was previously owned by Wilson's parents, but is now owned by a third, unrelated party.

Paxton and two photographs of the Askew address were admitted into evidence. The photographs show the front door and all visible windows covered with plywood and overgrown vegetation around the residence. Buchanan testified that she passes the Askew address three to four times per week and she has seen "no activity, no life" there. She denied ever seeing Wilson at the Askew address or ever noticing any construction or renovations at the property prior to Wilson's qualifying to run for mayor. However, Buchanan further testified that the day after qualifying, the boards were removed from the house, a 911 sign was visible and the grass was cut. Finally, Buchanan testified that in her work as an insurance agent, she travels around town and that she has not seen Wilson in town. Wilson was in Buchanan's office during the spring and told her that he "was in and out from here to Alabama."

On cross-examination, Buchanan testified she had knowledge that the Askew address was "family property" formerly run as a daycare by "Ms. Naomi" who was Wilson's now deceased aunt. Buchanan denied having any prior knowledge that Wilson intended to move into, or provide the Askew address as his domicile for qualifying. Buchanan agreed that she was not certain that Wilson did not reside "in the city." When questioned about the instance when Wilson was in Buchanan's office, she stated that she had no reason to question Wilson's domicile at that point because he told her he was visiting from Alabama for a city council meeting. It was also brought out through Buchanan's testimony that the purpose for that visit by Wilson (and Wilson's brother) was to introduce to the city council a company that could in some way help with the "water situation" in Tallulah at that time.

3

On redirect examination, Buchanan confirmed that her challenge to Wilson's candidacy was based on Wilson's listing his place of domicile as the Askew address and that he has not lived at that address for the year preceding qualification for the mayoral election and, thus, is ineligible to run for the office.

Glen Dixon, investigator with the district attorney's office, testified next regarding his investigation of Buchanan's challenge to Wilson's qualifications. A certified copy of Wilson's Notice of Candidacy was introduced through this witness, as well as a certified document from the tax assessor showing that the owner of the property at the Askew address is Leo Jordan of Henderson, Nevada. Dixon testified that he was unable to reach Jordan. Dixon testified that he went to the Askew address and knocked on the door. The boards had been removed from the door and windows and, when Dixon's knock was unanswered, he noticed that a neighbor's door was open. Dixon spoke with neighbor, who advised him that nobody had lived in the house "for a good while." Dixon took photographs of the property, which were introduced into evidence. The photographs show that the boards had been removed and the grass had been cut. There was no gas meter at the house. Dixon testified there was an electric line and meter, but he did not check to see if the meter was running, nor did he know or confirm whether there was electric service to the residence. Dixon did, however, confirm with the water department that there was no water service to the property and the last date there was water service to the Askew address was in 2014.

Dixon further testified he obtained by subpoena certified copies of various documents from the Registrar of Voters pertaining to Wilson. These items were introduced into evidence with no objection and included the

following.[2]  The Voter Information Report, printed on August 13, 2019, lists the Askew address as Wilson's residence and mailing address, indicates his status as "inactive," and his registration date as October 2, 1992.  The printout of the voter detail screen, dated and timed August 13, 2019, at 11:47 a.m., includes a legend at the bottom left corner indicating that Wilson's inactive status was due to "address correction required" and indicating an open event of "Address Confirmation Card."  The Address Confirmation Card signed by Wilson is dated July 11, 2019, and lists the Askew address as his "residential address (place where I live and claim a homestead exemption, if any)."  Also introduced was a letter from the Jefferson County Commission, Alabama, stating that there was no record of Wilson ever having been registered to vote in Alabama.  Next, a letter from the Alabama Probation and Parole Office dated September 5, 2018, addressed to Wilson at 3123 Enclave Lane, Birmingham, Alabama 35068, was introduced.  That letter was stamped by the Registrar of Voters on September 18, 2018.  The next document was a Louisiana Voter Registration Application filled out by Wilson, signed and dated September 18, 2018.  The residence address provided by Wilson was 505 Geneva Ln, Tallulah, Louisiana 71282.  Wilson listed his place of last residence as the Enclave Lane, Birmingham, Alabama address.  Also on this document, Wilson checked the box indicating that he did not have a Louisiana driver's license or identification card.  Wilson indicated that his place of past voter registration was Madison Parish.

---

[2] Wilson asked the court at the beginning of trial to "call" the Registrar of Voters down to the courtroom to testify.  When the trial court advised Wilson that he would need to subpoena his witnesses, Wilson stated that it was not necessary for the registrar to testify and he made no objection to the introduction of the certified records through Dixon's testimony.

Dixon testified that, prior to obtaining the above information from the Registrar of Voters, his office requested Wilson provide the documents as well. On August 13, 2019, Wilson provided Dixon with two documents: proof of voter registration and a lease on the Askew address. The first document is a voter detail computer screen printout dated and timed August 13, 2019, 12:48 p.m. (an hour after the previously discussed printout that was subsequently obtained by Dixon via subpoena), which indicates Wilson's residence address as the Askew address and his voting status as "active." The second document was a Residential Lease Agreement for the Askew address between Leo Jordan, lessor, and Wilson, lessee, dated May 1, 2018, and expiring on May 1, 2020.

Dixon further testified that he did an NCIC search on Wilson which revealed that his driver's license was issued by the State of Alabama. Two vehicles were also registered in the name Wilco Homes, Inc., or Antonio Wilson at the Alabama address. The first vehicle was a Tundra 4x4 Crew Max. Registration on the Tundra was to expire on November 30, 2019, and the tags for the vehicle were issued on February 25, 2019. The second vehicle was an F150 Excel Supercab registered to the same name and address. The tags on the F150 were issued on November 29, 2017, and expired in October 2018. Dixon further testified that the search revealed that Wilson did have a Louisiana identification card, but not a driver's license. Dixon had not yet received documentation from the Office of Motor Vehicles; however, the district attorney had a faxed copy of a Louisiana identification card, which was introduced with no objection. The identification card was issued on August 2, 2019, to Antonio Terrell Wilson at the Askew address.

6

Regarding Wilco Homes, Inc., Dixon testified that the Alabama Secretary of State's website indicated that Wilson is the registered agent of the company at the Enclave Lane, Alabama address. The business is active and expires on March 22, 2023.

On cross-examination, Wilson questioned Dixon about the active versus inactive voter detail printouts and Dixon stated that he could not provide an explanation as to the discrepancy. Regarding the photographs Dixon took of the Askew address, Dixon confirmed that there was no gas meter and that he saw, but did not photograph, a line and electric meter. Dixon did not check to see if the electric meter was running. Finally, Dixon stated that he did not investigate if the property was in violation of any ordinances for overgrown vegetation, and he did not check to see if the property taxes were paid.

On redirect examination, Dixon clarified that he was not the proper person to interpret and explain the discrepancies in the voter detail printouts.

Michael Washington, the sole civil process server for the Madison Parish Sheriff's Office, testified next. Deputy Washington testified that he has made a lot of services in the area of the Askew address, and he made service at the Askew address when Ms. Naomi was running the daycare there. He agreed that the daycare was "vibrant" when it was operating. Deputy Washington recalled that the daycare was closed and the structure was boarded up around 2014. Deputy Washington further testified that, thereafter, he observed the boarded window, vegetation overgrowth and vehicles with broken out windows parked at the Askew address. When asked to view the photographs provided by Buchanan showing the boarded-up residence, Dep. Washington agreed that he had observed the Askew

address in that condition up until "really this month." Deputy Washington testified that he had seen no construction or other activity at the Askew address. He further testified he attempted service of the petition in the instant matter on Wilson at the Askew address the day before trial. Deputy Washington stated the boards had been removed, but he was unable to locate anyone on the premises. Deputy Washington testified he looked through the window in the door and saw there was no furniture in the house except for a "church bench." He agreed the residence was uninhabited.

On cross-examination, Dep. Washington testified he had been in the house at the Askew address several times before the daycare closed. When questioned about his observation of the church bench, Dep. Washington stated he could see that it was in the second or middle room. Deputy Washington also agreed that as of the day before trial, the grass had been cut at the Askew address.

Sharon Jackson lives across the street from the Askew address and testified next. Jackson testified she has lived on Askew Street for eight years, and she has a clear view of the Askew address. Jackson described the house as "growed up" and "like just non-existence, like nobody's there." Jackson stated she did not pay enough attention to, or focus on, whether the house was boarded up; however, she stated she never noticed any work or construction being done at the house. Jackson denied knowing Wilson or seeing him on the Askew address property, but did state she has talked with him from his car as he was driving by the Askew address. Jackson agreed the property appeared to be uninhabited.

The state rested and Wilson called two witnesses.

Carlos Ford testified Wilson assists him with outreach programs and sees Wilson "quite a few" times a week. Ford stated he has seen Wilson at every city council meeting he has attended.

On cross-examination, Ford testified there are two city council meetings per month. Ford further testified he had seen Wilson at the Askew address. Ford was aware the house had been boarded up until the previous week, but stated he had seen Wilson "going in through the front. I've seen him come around the back. Now when you say going in and out, I've seen him actually walk around the property. Now, I don't see that area a whole lot, but the time I saw him that's what I witnessed." Ford then clarified he had seen Wilson "come from behind, behind that structure, yeah." When asked if Ford was saying that Wilson lives there, he replied, "I've seen him, yes. Yes, as far as, I've seen [*sic*] over at Tammy's, his sister." The following exchange then occurred:

DA:   So do you know where he lives?

Ford:   Tammy.

DA:   So you, if he said in his candidacy that his domicile was 1005 West Askew, it's your testimony that that's not true?

Ford:   No I wouldn't say that. I wouldn't say that, no.

DA:   Are you saying he live [*sic*] with Tammy or does he live at 1005?

Ford:   I believe he's over at Tammy's quite a bit because of, she has an illness.

DA:   Does he live, where are you saying he lives? You're telling me two different things.

Ford:   Well, you asked me to answer, I would say at the West Askew.

DA:   Do you know for sure where he lives?

9

Ford: Do I know for absolutely sure?

DA: Sure.

Ford: No.

Ford further testified he knew people who would live in a house with no water service due to the water quality in Tallulah.

On redirect, Ford clarified he knew people who would not use Tallulah water, stating jokingly, "Don't drink the water." Ford further agreed he had seen Wilson outside of the residence at the Askew address, but Ford also stated he had not been inside the residence.

Tammy Wilson, Wilson's sister testified next. Tammy explained the 402 6th Street address was their childhood home and is now owned by someone outside of the family. The following exchange then occurred:

Wilson: Will it be true, where do I lay my head today?

Tammy: At my house.

Wilson: Can you tell the Courts how long I've been laying my head there?

Tammy: I can tell you about how long, not just how long. It's been a little over a year. Maybe, oh Lord. Maybe April of [sic] March of last year for sure.

* * * *

Tammy then confirmed the Askew address used to be Ms. Naomi's daycare and testified Wilson was doing renovations on the residence there.

On cross-examination, Tammy stated her address as 505 Isabel Lane in Tallulah Estates, which she rents. When asked if Wilson was on the lease, Tammy stated, "No. I never put him on, but [the landlord] knows he lives there." Tammy testified Wilson was planning on moving into the residence at the Askew address after he "got it fixed up." Tammy stated she had

10

arranged for the yard to be done and she "paid the guys and stuff for fixing and going to take stuff away from there . . . just trees and stuff around the grounds that don't need to be there, like trees and stuff." Tammy could not recall precisely when she took care of these things for Wilson and advised she was on dialysis and had a lot going on. Tammy further denied any knowledge of a water-related business Wilson planned to bring to Tallulah, but she was aware of his business in Alabama.

Tammy further testified she knew Wilson was a registered voter in Louisiana because his registration was mailed to her house or P.O. Box. The district attorney questioned Tammy about the discrepancy in Wilson's address on his voter registration which showed an address of 505 Geneva Lane, rather than Isabel Lane. Tammy testified Geneva Lane is the main road in Tallulah Estates, but her home is actually on Isabel Lane. Tammy acknowledged Wilson provided the incorrect address and consistently testified Wilson lived with her at 505 Isabel Lane. Regarding the Askew address, Tammy again stated that Wilson was planning on living there, "but he doesn't live there."

On redirect, Tammy agreed Wilson simply could have made a mistake on his voter registration and he did, in fact, live at 505 Isabel Lane, Tallulah. Tammy stated Wilson had voted with her "the last voting time" at the Farmer's Market and there were no problems with Wilson voting. Tammy also testified Wilson has gotten out of bed "several times" in the last 12 months or more to take her "to emergencies or whatever."

During Tammy's testimony, Wilson attempted to offer into evidence a certified letter written by Leo Jordan dated August 14, 2019, stating that Wilson leases the Askew address for "use as a residential premises" and is

11

authorized to "make improvements to the Property suitable to his use." The assistant district attorney initially objected that the letter was hearsay and she had not been provided the letter in advance of trial. The trial court advised Wilson he could not offer the letter through Tammy, at which time Wilson finished questioning Tammy and then stated he would like to testify so he could introduce the letter. At that point, the assistant district attorney withdrew her objection to the letter, and it was admitted without Wilson's taking the stand. Wilson rested.

Following arguments and a recess, court reconvened and the trial judge issued an oral ruling. It is clear from the record the trial judge had familiarized herself with the applicable statutes and jurisprudence regarding election challenges and issues pertaining to domicile prior to ruling. The trial judge paid close attention to the testimony and outlined the facts and evidence presented. The trial judge found that the state met its burden of proving that Wilson did not reside at 1005 West Askew Street, Tallulah, the domicile he provided on his Notice of Candidacy. Accordingly, the trial judge ruled that Wilson failed to meet the qualifications to run for mayor of Tallulah. In her oral reasons, citing the documentary evidence and testimony, the trial judge found that Wilson did *intend* to establish his domicile at the Askew address, despite the fact that some of Wilson's attempts to show this occurred after his qualification for candidacy. However, noting that domicile is not only intent, but also residence, the trial judge found the state proved Wilson did not reside at the Askew address for the year preceding qualification.

The written reasons indicate the trial court followed the principles as set forth by the Louisiana Supreme Court in *Landiak v. Richmond*, 05-0758

12

(La. 3/24/05), 899 So. 2d 535, and viewed the evidence in light most favorable to the candidate seeking office. The trial judge found, however, that Wilson had every opportunity during the year preceding qualification to make the necessary renovations to the Askew residence and to obtain utilities. She noted that Wilson did not attempt any repairs or obtain a Louisiana identification card until the instant suit was filed, nor did Wilson file an affidavit of change of domicile pursuant to La. C.C. art. 44. The trial judge further queried why there was no allegation or argument that Wilson resided at his sister's address of 505 Isabel Lane. The trial judge noted, on this record, questions remain as to whether either address falls within the municipality of Tallulah, whether the 6th Street address was Wilson's residence, and whether Wilson intended to abandon his Alabama domicile.

Final judgment in accordance with the above state reasons was signed on August 16, 2019, at 1:30 p.m. This appeal followed.

### LEGAL PRINCIPLES

The qualifications for mayor are set forth in La. R.S. 33:384, which provides:

> The mayor shall be an elector of the municipality who at the time of qualification as a candidate for the office of mayor shall have been domiciled and actually resided for at least the immediately preceding year in the municipality.

A candidate sets out his qualifications in the initial filing of notice of candidacy under La. R.S. 18:461. A notice of candidacy shall be in writing and shall state the candidate's name, the office he seeks, the address of his domicile, and the parish, ward, and precinct where he is registered to vote. La. R.S. 18:463(A)(1)(a). The notice of candidacy shall contain a certificate signed by the candidate certifying, *inter alia*, that he meets the qualification

13

of the office for which he is qualifying and that all of the statements contained in it are true and correct. La. R.S. 18:463(A)(2)(a)(ii) and (viii).

The purpose of the notice of candidacy is to provide sufficient information to show a candidate is qualified to run for the office he seeks. *North v. Doucet*, 18-437 (La. App. 5 Cir. 8/1/18), 253 So. 3d 815, 820, *writ denied*, 2018-1294 (La. 8/3/18), 249 So. 3d 829; *Trosclair v. Joseph*, 14-675 (La. App. 5 Cir. 9/9/14), 150 So. 3d 315, 317, *writ not cons.*, 2014-1909 (La. 9/12/14), 148 So. 3d 572, and *writ not cons.*, 2014-1920 (La. 9/12/14), 148 So. 3d 937.

When the qualifications include a length of domicile requirement, the candidate shall meet that qualification notwithstanding any other provision of law to the contrary. *Kelley v. Desmarteau*, 50,552 (La. App. 2 Cir. 9/28/15), 184 So. 3d 55; *Morton v. Hicks*, 46,991 (La. App. 2 Cir. 9/28/11), 74 So. 3d 268, *writ denied*, 2011-2140 (La. 9/30/11), 71 So. 3d 297; *Thebeau v. Smith*, 49,665 (La. App. 2 Cir. 9/8/14), 148 So. 3d 233. A qualified elector may bring an action objecting to the candidacy of a person who qualified as a candidate in a primary election for an office in which the plaintiff is qualified to vote. La. R.S. 18:1401(A). An action objecting to the candidacy of a person who qualified as a candidate in a primary election shall be based on specific grounds which may include that the defendant does not meet the qualifications for the office he seeks in the primary election. *See* La. R.S. 18:492.

Louisiana R.S. 18:451, relative to qualifications of candidates, specifically requires that when the qualifications for an office include a residency or domicile requirement, a candidate shall meet the established length of residency or domicile. As is evident from the use of the word

14

"shall" in the statute, the requirement is mandatory. La. R.S. 1:3; *Landiak v. Richmond, supra*; *Thebeau v. Smith*, *supra*.

Because election laws must be interpreted to give the electorate the widest possible choice of candidates, a person objecting to candidacy bears the burden of proving that the candidate is disqualified. *Landiak v. Richmond, supra; Russell v. Goldsby,* 2000-2595 (La. 9/22/00), 780 So. 2d 1048; *Thebeau v. Smith, supra*. It follows when a particular domicile is required for candidacy, the burden of showing lack of domicile rests on the party objecting to the candidacy who must establish a *prima facie* case that the candidate does not meet the domicile requirement. The burden then shifts to the opposing party to present sufficient evidence to overcome the *prima facie* case. *Landiak v. Richmond, supra*; *Thebeau v. Smith, supra*. A court determining whether the person objecting to candidacy has carried his burden of proof must liberally construe the laws governing the conduct of elections so as to promote rather than defeat candidacy. Any doubt concerning the qualifications of a candidate should be resolved in favor of allowing the candidate to run for public office. *Landiak v. Richmond, supra; Thebeau v. Smith, supra; Kelley v. Desmarteau*, *supra*.

The terms "residence" and "domicile" are legal terms that are not synonymous. *Landiak v. Richmond, supra*; *Kelley v. Desmarteau, supra*. An individual's domicile is the place of his habitual residence. La. C.C. art. 38. The most significant difference between the two concepts is that a person can have several residences, but only one domicile. La. C.C. art. 39; *Landiak v. Richmond, supra*. Domicile is an issue of fact that must be determined on a case-by-case basis. *Landiak v. Richmond, supra; Kelley v. Desmarteau, supra*.

15

Every person has a domicile of origin that he retains until he acquires another. La. C.C. art. 44; *Landiak v. Richmond, supra.* A change in domicile occurs when there is a change in actual residence accompanied by an intention to make a new principal establishment or home. La. C.C. art. 44; *Messer v. London,* 438 So. 2d 546 (La. 1983). The determination of a party's intent to change his or her domicile must be based on the actual state of the facts, not simply on what the person declares them to be. *Landiak v. Richmond, supra; Thebeau v. Smith, supra; Kelley v. Desmarteau, supra.*

There is a presumption against change of domicile. *Landiak v. Richmond, supra; Messer v. London, supra; Becker v. Dean, supra.* The party seeking to show that domicile has been changed must overcome that presumption by presenting positive and satisfactory proof of establishment of domicile as a matter of fact with the intention of remaining in the new place and of abandoning the former domicile. *Landiak v. Richmond, supra.*

Louisiana courts commonly consider a number of different factors when trying to determine domicile in fact. Since domicile is generally defined as residence plus intent to remain, a party's uncontroverted testimony regarding his intent may be sufficient to establish domicile, in the absence of any documentary or other objective evidence to the contrary. A sworn declaration of intent recorded in the parish from which and to which he intends to move may be considered evidence of intent. La. C.C. art. 45. In the absence of such a formal declaration, when documentary or other objective evidence casts doubt on a person's statements regarding intent, it is incumbent on courts to weigh the evidence presented in order to determine domicile in fact. Otherwise, the legal concept of domicile is meaningless and every person would be considered legally domiciled wherever he says

16

he is domiciled. *Landiak v. Richmond, supra; Kelley v. Desmarteau, supra.* Absent declaration to change domicile, proof of this intention depends on the circumstances. *Russell v. Goldsby, supra*; *Kelley v. Desmarteau, supra.* Some of the types of documentary evidence commonly considered by courts to determine domicile in fact include such things as voter registration, homestead exemptions, vehicle registration records, driver's license address, statements in notarial acts, and evidence that most of the person's property is housed at that location. *Thebeau v. Smith, supra; Kelley v. Desmarteau, supra.*

The district court's factual findings regarding domicile are subject to manifest error review. In order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Thebeau v. Smith, supra; Kelley v. Desmarteau*, *supra*.

**DISCUSSION**

On appeal, Wilson first submits that the trial judge committed legal error in impermissibly shifting the burden of proof under *Landiak v. Richmond, supra*, by requiring Wilson to prove his domicile was located in Tallulah rather than requiring the state to prove that his domicile was somewhere other than Tallulah. Second, Wilson contends the trial judge committed manifest error in its application of the facts.

17

Wilson argues a candidate for mayor must 1) be an elector of the municipality, 2) have been domiciled in the city of Tallulah for at least one year prior to qualifying, and 3) have actually resided in the city of Tallulah for at least the year preceding qualification. The state, not Wilson, must prove by a preponderance of the evidence that Wilson is not domiciled in Tallulah. Wilson argues the state failed to do so. Wilson emphasizes the trial court found that he intends to remain and the state offered no evidence to rebut the testimony of Tammy Wilson and Carlos Ford that Wilson had resided in Tallulah for more than a year prior to qualification.

The state argues it produced uncontradicted evidence that Wilson did not reside at the address he provided on his Notice of Candidacy. The state notes that Tammy Wilson affirmatively testified Wilson did not reside at the Askew address. Wilson's intent to make that address his residence/domicile is insufficient to satisfy the actual residence component of legal domicile. The state points out the fact Wilson did not testify on his behalf. Thus, the record lacks any evidence Wilson actually resided in Tallulah. According to the state, there was ample evidence presented that Wilson is not domiciled at the Askew address and, at most, the record establishes Wilson spends some nights with his sister at 505 Isabel Lane.

**ANALYSIS**

As an initial matter, we address the question of whether Wilson presented sufficient evidence to overcome the presumption against his change of domicile from Alabama to Tallulah, Louisiana. *Landiak v. Richmond, supra; Messer v. London, supra*; *Becker v. Dean, supra*. Recall that the party seeking to show that domicile has been changed must overcome that presumption by presenting positive and satisfactory proof of

18

establishment of domicile as a matter of fact with the intention of remaining in the new place and of abandoning the former domicile. *Landiak v. Richmond, supra.* Based on the record before us, we cannot say the evidence is sufficient to overcome this presumption. Significantly, Wilson did not testify. Thus, the record contains no direct statement of Wilson's intent regarding his domicile. Further, Wilson did not file an affidavit of domicile as allowed by La. C.C. art. 45. We are, therefore, tasked with considering the following evidence: Wilson has a current driver's license in Alabama; Wilson's business is registered and active in Alabama and Wilson is the registered agent for that business; Wilson has at least one vehicle with a current registration and tags at his Alabama address; Wilson had a two-year lease on the Askew address, however, he did not begin repair or renovations at the Askew address, his stated resident domicile, until after this suit was filed; the residence was boarded up and overgrown with vegetation until the day after qualifying and has not had water service since 2014; and, Wilson did not obtain a Louisiana identification card until August 2, 2019. See *Thebeau v. Smith, supra; Kelley v. Desmarteau, supra.* While there was some testimony that Wilson travelled to Tallulah periodically to attend council meetings, possibly presented a new business idea to the city council, was registered to vote and had voted in the past in Tallulah, and stayed at his sister's house while in Tallulah, we find this evidence insufficient to overcome the presumption against change of domicile. *Landiak v. Richmond, supra*; *Messer v. London, supra*; *Becker v. Dean, supra*. Finally, we note that at no point has Wilson argued that the Isabel address is his domicile, leaving this Court with the presumption by statute that Alabama remains his domicile until it is actually established elsewhere.

19

While our inquiry could end here, we will further address the issue of domicile for purposes of qualifying for the October mayoral election. The first question is whether the state carried its initial burden of proving Wilson does not meet the domicile requirement. To carry its burden, the state had to make out a *prima facie* case that Wilson was not domiciled and did not actually reside for at least the immediately preceding year in the municipality. La. R.S. 33:384. Critically, Wilson provided, and certified that, the Askew address was his resident domicile on his Notice of Candidacy. Thus, the state was required to show said address was not Wilson's domicile. We find the state made such a *prima facie* showing. With regard to the actual residence component of domicile, we find the photographic evidence of the Askew address, prior to and the day after qualifying, the testimony that the Askew address was uninhabited, was boarded up until the day after qualifying, has not had water service since 2014 and contains none of Wilson's belongings or furniture, sufficient to make out a *prima facie* case that Wilson did not actually reside at the address he provided as his resident domicile on his Notice of Candidacy. Indeed, Tammy Wilson's testimony was that Wilson actually resided in her home at 505 Isabel Lane for the year preceding qualification. Notably, while Wilson did not testify, in his questioning of his sister, Wilson agreed he had laid his head at her home for the year preceding qualification.

With the state having made a *prima facie* showing, the burden then shifted to Wilson to present countervailing evidence to overcome the state's proof. Wilson presented the testimony of his sister, Tammy, and Carlos Ford. Ford provided little testimony of use. Ford testified he had seen Wilson walking the property at the Askew address. Ford had never been

20

inside the residence and acknowledged it had been boarded up. Ford's testimony was inconsistent regarding whether Wilson lived at the Askew address or at Tammy's residence. Tammy testified Wilson had been living at her home at 505 Isabel Lane in Tallulah Estates since March or April of the previous year. Tammy testified her landlord was aware Wilson was living there. Tammy further testified Wilson planned on renovating the residence at the Askew address and was going to move into that home when he got it "fixed up." However, Tammy could not recall what work had been done to the Askew residence or when any such work had been done. The trial judge made a credibility determination after hearing the testimony of Ford and Tammy and ultimately concluded that Wilson had not met his burden of overcoming the state's *prima facie* case. Looking at this case under the manifest error doctrine, we cannot say that the trial judge was manifestly wrong in her determination. As such we will not disturb that finding on appeal. *Thebeau v. Smith, supra*; *Kelley v. Desmarteau, supra*.

We find that the record supports the trial court's decision. Finding no legal or manifest error, we affirm the judgment of the trial court.

## CONCLUSION

For the foregoing reasons, the ruling of the trial court disqualifying Antonio T. Wilson as a candidate for the office of mayor of Tallulah, Louisiana, is affirmed. Costs of appeal are assessed to Antonio Wilson.

**AFFIRMED**.

**GARRETT, J., dissenting.**

I respectfully dissent and would reverse the ruling made below. The key question in this case is whether the state established that the defendant was not domiciled in the City of Tallulah for the requisite period of time. The petition to disqualify alleged that the defendant was not domiciled in the City of Tallulah. In my view, these allegations were not proven. The evidence showed that the defendant had executed a two year lease on property located in Tallulah on May 1, 2018, but was not actually living there at the time of qualifying, as the property needed to be renovated. The evidence showed that he had been living with his sister, Tammy Denise Wilson, at her house at 505 Isabel Lane for the requisite time period. There was testimony that he had voted in Tallulah without any difficulty and that he regularly attended City of Tallulah city council meetings, in addition to other activities.

In her reasons for ruling, the trial judge noted that the record was unclear on whether the sister's home was in Tallulah. This observation is simply incorrect. When the assistant district attorney was questioning Tammy Wilson, the following colloquy occurred:

BY MRS. MACK:

Q.     Can you restate your full name for me?

A.     Tammy Denise Wilson.

Q.     Tammy Wilson. And Ms. Wilson, *where exactly do you live here in Tallulah*?

A.     I live 505 Isabel Lane.

Q.     505?

A.     Ah-hah (yes).

1

Q.      What was the last part?

A.      Isabel Lane.

Q.      Isabel Lane?

A.      Ah-hah (yes).

Q.      And is it a home that's there or an apartment or what?

A.      It's a home.

Q.      And are you buying that location?

A.      I'm just living there.  I'm just renting right now.

Q.      Okay, you're renting?

A.      Um-hum (yes).

Q.      Is it, what type of home is it, is it owned privately or is it a government home, what type of place is this?

A.      I guess it's owned privately.

Q.      Okay.  What's the name of the location?

A.      *Tallulah Estates*.  I'm sorry.

Q.      *Tallulah Estates*?

A.      Um-hum (yes).  [Emphasis supplied.]

The trial court did not make a credibility determination adverse to Tammy Wilson.  In my view, the above quoted testimony established that the sister's home where the defendant was living for the requisite amount of time was in the City of Tallulah.  Accordingly, the defendant met the qualifications to run for mayor of the City of Tallulah, and the trial judge erred in ruling otherwise.

2